**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| JULIE NORTHRUP; and RICKARD SCRUGGS, | |
| Plaintiffs, | CIVIL ACTION NO.: 2:17-cv-126 |
| v. | |
| PAUL GEORGE, individually and in his official capacities, | |
| Defendants. | |

## <u>O R D E R</u>

Presently before the Court are the parties' cross motions for summary judgment: Plaintiffs' Motion for Summary Judgment and Request for Oral Argument, (doc. 26), and Defendant Paul George's Motion for Summary Judgment, (doc. 37).[1] This 42 U.S.C. § 1983 case arises out of a traffic stop instigated by Defendant George. The parties dispute whether Defendant had reasonable suspicion for the initial traffic stop, whether he prolonged the traffic stop in violation of the Fourth Amendment, and whether he is entitled to qualified immunity.[2] While the Court finds that Defendant did prolong the stop, genuine issues of material fact remain

---

[1]   At the time both summary judgment motions were filed, Defendant George had multiple co-Defendants. However, Plaintiffs moved for summary judgment only as to the liability of Defendant George. (Doc. 26.) The cross-motion for summary judgment was filed by all of the then-named Defendants (including Defendant George). (Doc. 37.) Since then, all Defendants except for Defendant George have been dismissed from the case. (Doc. 52.) As a result, the Court refers to the cross-motion simply as Defendant George's Motion. Additionally, while Defendant filed a Motion for Summary Judgment, (doc. 37), and a separate Response to Plaintiffs' Motion for Summary Judgment, (doc. 41), those two documents are identical; to avoid confusion and for consistency's sake, the Court will only cite to Defendant's Motion, (doc. 37), and will not cite to the identical Response.

[2]   Both Plaintiffs and Defendant move for summary judgment in their favor on the first two issues. Defendant George is the sole movant on the qualified immunity issue.

as to whether he was justified in doing so and whether he had a proper basis for initiating the stop in the first place.  These issues must be resolved by a jury.  Additionally, the Court finds that Defendant George is not entitled to qualified immunity.  Accordingly, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and Request for Oral Argument,[3] (doc. 26), and **DENIES** Defendant's Motion for Summary Judgment, (doc. 37).

## BACKGROUND

### I.    Procedural History

Plaintiffs filed this suit in October 2017, (doc. 1), and subsequently filed an Amended Complaint, (doc. 17), alleging violation of their Fourth Amendment rights pursuant to 42 U.S.C. § 1983.  (Id.)  Specifically, they allege that Defendant committed "unlawful acts of detention, search and seizure."  (Id. at p. 8.)  Plaintiffs assert claims against Defendant George in both his individual and official capacities, and they seek compensatory and punitive damages.  (Id. at pp. 2, 9.)  Plaintiffs filed a Motion for Summary Judgment as to Defendant George's liability on June 6, 2018, (docs. 26, 26-1), and Defendant filed his own Motion for Summary Judgment on July 2, 2018, (doc. 37, 37-1).

### II.   Factual Background

The events giving rise to this action took place on January 18, 2017, when Defendant Paul George, a narcotics investigator in Glynn County, Georgia, pulled over Plaintiff Rickard Scruggs (at times, "Mr. Scruggs") and Plaintiff Julie Northrup (at times, "Ms. Northrup") for an alleged license plate violation.  (Doc. 17, pp. 2–3.)  The entire 36-minute traffic stop was captured by Defendant's Body Camera Recording ("BCR"), which has been reviewed by the

---

[3]  Pursuant to Local Rule 7.2, Plaintiffs requested oral argument on their Motion to Dismiss.  (Doc. 26.) Defendant did not respond to Plaintiffs' request.  The Court, having read and considered the parties' Motions and all of the related filings and briefs, found sufficient bases to issue an Order without oral argument and, therefore, **DENIES** Plaintiffs' request.

Court.  (Doc. 28-1 (BCR).)  However, this traffic stop was not Defendant's first interaction with Mr. Scruggs.  (Doc. 27, p. 7.)  In 2015, Defendant executed a search warrant at Mr. Scruggs' residence.  (Id.)  The relevant details from both events will be discussed in turn.

### A. History Between Plaintiff Scruggs and Defendant George

In 2015, Defendant George executed a search warrant at 330 Broadway Street in Saint Simons Island, Georgia.  (Doc. 37-2, p. 1.)  Mr. Scruggs and a woman named Kimberly Brown were inside the residence at the time of the search and Mr. Scruggs identified himself as the "primary lessee."  (Id. at p. 2.)  Drugs and firearms were discovered in the house and Mr. Scruggs was arrested.  (Id.; doc. 27, p. 7.)  Mr. Scruggs was subsequently charged with possession of a firearm by a convicted felon and possession of controlled substances.  (Id.)  However, both charges against Mr. Scruggs were ultimately dismissed.  (Doc. 37-1, p. 4.)  Ms. Brown, who is not a party to this action, pleaded guilty to the drug charges.  (Id.)

### B. The 2017 Traffic Stop

#### 1. Undisputed Facts

Around 1:45 p.m. on January 18, 2017, Defendant George called dispatch and inquired about tag number "PHU1437."  (Id. at p. 5.)  The dispatcher informed Defendant that the tag belonged to a "2004 Toyota Corolla, silver color."  (Doc. 53-1, p. 2.)  At some point after receiving this information, Defendant initiated a traffic stop of a 2013 Chevrolet Avalanche with the tag number "PHU1387."  (Doc. 28-1 (BCR).)

The video recording of the traffic stop began when Defendant turned on his body camera around 2:18 p.m.  (Id.)  Prior to approaching the Avalanche, Defendant called in the Avalanche's tag number—"PHU1387"—but exited his vehicle before receiving any information on the matter.  (Id. at 14:19:01.)  Defendant approached the vehicle on the driver's side, finding Mr.

Scruggs in the driver's seat and Ms. Northrup in the front seat as a passenger.  After identifying himself and greeting Mr. Scruggs by his name, Defendant explained that he stopped the car because the tag did not "come back" to the Avalanche.  (Id. at 14:19:35–14:20:02.)  Ms. Northrup stated that the vehicle belonged to her husband and, upon Defendant's request, Plaintiffs provided Defendant with their driver's licenses.  (Id.)  Mr. Scruggs presented a Tennessee license.  (Id.)  Next, Defendant asked Plaintiffs if they had anything illegal in the car, "such as guns, drugs, or alcohol," and Plaintiffs answered that they did not.  (Id. at 14:20:48.) Defendant then asked Plaintiffs whether they consented to a search of the vehicle.  Both Mr. Scruggs and Ms. Northrup denied consent.  (Id. at 14:20:53.)  Defendant next asked Plaintiffs to exit the Avalanche, at which point Defendant returned to his unmarked police car.[4]  (Id. at 14:21:45.)

Once he was back in his vehicle, Defendant immediately called for a K-9 unit and requested that other police officers meet him at the scene with the proper citation book (for the tag violation).  (Id. at 14:21:58–14:23:50.)  Approximately four minutes after returning to his car and seven minutes into the stop, Defendant called in the Avalanche's tag information once more and determined that the Avalanche was properly tagged.  (Id. at 14:25:40–14:26:21.)  Defendant then attempted to confirm Plaintiffs' driver's licenses.  The service quickly confirmed Ms. Northrup's license, but was unable to locate information regarding Mr. Scruggs' Tennessee license.  (Id. at 14:26:32–14:29.)

Officer Anthony Clark arrived at the scene around 2:30 p.m.—about twelve minutes after Plaintiffs were stopped—and approached Defendant's vehicle.  (Id. at 14:30–14:31:30.) Defendant George explained that he had "done a search warrant at [Mr. Scruggs'] house a while

---

[4]  Plaintiffs remained out of the Avalanche until the end of the traffic stop, at 2:54 p.m. (Doc. 26-1, p. 27.)

ago" and further admitted that, in this instance, he must have originally called in the wrong tag because the Avalanche was adorned with the correct plate.  (Id.)  After informing Officer Clark that Mr. Scruggs had "denied consent," Defendant stated that Mr. Scruggs "should be on probation," and that he wanted to confirm Mr. Scruggs' probationary status as to conduct a "Fourth Amendment search on him."  (Id.)  Finally, Defendant explained that he was going to write Mr. Scruggs a citation for not having a Georgia driver's license and hoped that the K-9 unit would arrive by the time the citation was issued.  (Id.)  Defendant then exited his vehicle and approached Officer Clark's police car.  (Id. at 14:31:41.)  For the next five minutes, Defendant continued his attempts to determine whether Mr. Scruggs was on probation, eventually learning that he was not.  (Id. at 14:32:00–14:37:35.)  Defendant also said that the criminal charges against Mr. Scruggs had been dismissed and his wife, Kimberly Brown, "had been the main target anyway."  (Id.)

At 2:38 p.m.—roughly twenty minutes into the traffic stop—Defendant returned to his vehicle with Officer Clark's citation book and began writing a citation for Mr. Scruggs' alleged license violation.  (Id. at 14:37:44.)  For the next three minutes, Defendant filled out portions of the citation form.  (Id. at 14:38–14:41.)  At 2:41 p.m., Defendant paused his endeavor to look at his phone and resumed the paperwork one minute later.  (Id. at 14:41–14:43:23.)  Soon thereafter, Officer Clark approached Defendant's vehicle.  (Id.)  Defendant again stopped writing and summarized his history with Mr. Scruggs, noting that he did not know Mr. Scruggs was in the Avalanche when he initiated the stop.  (Id. at 14:43:45–14:43:59.)  For the next thirty-seven seconds, Defendant intently filled out the citation form.  (Id. at 14:44:01–14:44:38.)  Defendant then did not write any additional information for sixty seconds while he and Officer Clark seemingly discussed equipment in Defendant's car.  (Id. at 14:44:38–14:45:38.)

Defendant spent the next four or so minutes attempting to discern where he first saw Plaintiffs' vehicle.  (Id. at 14:45:38–14:49:19.)  At approximately 2:45:51 on the BCR—twenty-seven minutes into the traffic stop—Defendant said, "I'm trying to think where I saw them first," and searched a map on his phone for about three minutes.  When he resumed writing the citation, Defendant said "[Mr. Scruggs] ran every stop sign on the way to get here, actually."[5]  (Id. at 14:49:11.)  At 2:50 p.m.—thirty-two minutes after Defendant stopped Plaintiffs' vehicle— Officer Lowther arrived with the K-9.  (Id. at 14:50:40; doc. 27, p. 6; doc. 38, p. 3.)  After walking around the Avalanche, the K-9 "did not alert to the presence of illegal substances that he's trained to detect."  (Doc. 37-2, p. 6.)  Defendant continued to intermittently fill out the citation form—pausing several times to converse with other officers—and eventually exited his vehicle with the completed ticket.  (Doc. 28-1, at 14:50:40–14:52:35.)  On the BCR footage, Officer Lowther and the K-9 can be seen standing next to Defendant's car door as Defendant left his car.  (Id. at 14:52:37.)

At 2:53 p.m., thirty-five minutes into the stop, Defendant walked over to Plaintiffs and handed Mr. Scruggs the completed citation form.  (Id. at 14:53.)  Defendant explained that Mr. Scruggs was in violation of Georgia law for not having obtained a Georgia license within thirty days of residing in Georgia.  (Id. at 14:53:10.)  Mr. Scruggs stated that he was a Tennessee resident but "comes down [to Georgia] all the time."  (Id. at 14:53:14–23.)  Defendant then asked, "What was your address on Broadway?"  (Id. at 14:53:26.)  Mr. Scruggs replied, "330 Broadway," and Defendant added the Broadway address to the citation.  (Id.; see doc. 37-9.)  Defendant handed Mr. Scruggs the citation and told Plaintiffs they were free to go.  (Doc. 28-1, at 14:54:30.)

---

[5]  Defendant did not write Mr. Scruggs a citation for a stop sign violation much less even mention this to Mr. Scruggs at any point during the stop.

2.        **Facts Disputed by the Parties**

While the parties do not dispute the events captured in the video, they do dispute what transpired prior to Defendant's initiation of the traffic stop.  Specifically, the parties contest where and when Defendant first saw the Avalanche.  Defendant George claims to have first observed the Avalanche approximately forty-five minutes prior to the stop.  According to Defendant, he had received a tip from a confidential informant that Kimberly Brown offered to sell the informant drugs.  (Doc. 37-1, p. 4.)  In light of the tip and his "previous discovery of drugs at the 330 Broadway house," Defendant claims that he suspected that "drugs were again being distributed from that house" and that he arrived "in the vicinity of the Broadway Street residence at approximately 1:30 p[.]m." (Id.)  Defendant avers that, upon his arrival, he saw "a silver Chevrolet Avalanche truck parked in the driveway" of 330 Broadway Street, and subsequently "ran the tag."  (Id. at pp. 4–5.)  As discussed above, Defendant called in "PHU1437," not "PHU1387," the Avalanche's correct tag number.  Defendant claims he must have misread the tag because he was "in surveillance mode." (Id. at p. 5.)  That is, Defendant did not want to draw "unnecessary attention to himself," and therefore called in the tag after driving past the residence and parking further down the street.  (Id.)  According to Defendant, he saw the Avalanche leave 330 Broadway Street "a short while later," and his decision to follow the vehicle was "based on the mistaken belief that the Avalanche had an improper tag." (Id. at pp. 5–6.)  Defendant claims that he then followed Plaintiffs at a "covert distance" to conceal his identity.  (Id.)  While following Plaintiffs, Defendant felt that the Plaintiffs were driving "in an evasive manner, not as far as speed but just as far turning multiple corners to see if the same vehicle follows you in that same maneuver." (Id. at p. 6 (citing George Depo. at p. 57).)  Defendant initiated the traffic stop after Plaintiffs turned onto Frederica Road.  (Id.)

While Plaintiffs do not dispute their presence at 330 Broadway Street on January 18, 2017, (see doc. 28-12), they do dispute Defendant's presence as well as his account of the events leading up to the traffic stop on that day.  Plaintiffs argue that Defendant did not have an informant and was never at 330 Broadway Street on the day of the traffic stop.  (Doc. 45-1, p. 2.) In support, Plaintiffs point to the recording of the traffic stop, which contains actions and statements by Defendant that directly contradict his current explanation of the events.   (Id.) Plaintiffs emphasize that, in the recording, Defendant spent four minutes attempting to discern where he first saw Plaintiffs' vehicle, ultimately stating that he originally saw the vehicle on McIntosh Avenue.   (Doc. 26-1, p. 22.)   He made no mention of 330 Broadway Street or surveillance in the video.  (Doc. 45, p. 2.)  Plaintiffs further note that the first time Defendant mentioned his purported surveillance at 330 Broadway Street was in his deposition, which took place approximately fourteen months after the traffic stop.  (Id.)

Defendant's proffered explanation for these contradictions is that he intentionally chose not to mention that he was surveilling 330 Broadway Street during the traffic stop because he knew the "body-camera recording could eventually become subject to inspection and copying." (Doc. 53, p. 4.)  Thus, he did not want the occupants of 330 Broadway Street to "become aware of his surveillance or the informant" through a later release of the footage.  (Id.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011)

(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. (emphasis and citations omitted).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984).

## DISCUSSION

### I.    The Parties' Arguments

Plaintiffs filed this case pursuant to 42 U.S.C. § 1983, alleging that the January 18, 2017, traffic stop violated their Fourth Amendment rights to be free from unlawful searches and seizures and that this violation was caused by Defendant's actions. (Doc. 17, p. 8.) As explained in their Motion for Summary Judgment, Plaintiffs first argue that Defendant lacked "an objectively reasonable ground to believe that the tag did not come back to the Avalanche" because he did not take any measures to determine whether his reading of the tag was correct despite having personal doubts about the accuracy of his memory. (Doc. 26-1, p. 7.) Plaintiffs further allege that Defendant unlawfully prolonged the traffic stop by detouring from his "traffic control mission" on several occasions to conduct unrelated inquiries and converse with other officers. (Id. at pp. 22–28.) Plaintiffs finally argue they are entitled to summary judgment because the circumstances surrounding the stop did not give Defendant independent reasonable suspicion to initiate the stop or wait for the K-9. (Id. at p. 11.) Plaintiffs point out that: (1) Defendant's testimony about conducting surveillance at 330 Broadway Street contradicts his behavior as displayed in the BCR where he spent over four minutes looking at a map attempting to locate where he first saw the Avalanche; (2) Defendant's lack of familiarity with the

surrounding streets in the BCR undermines his testimony regarding his belief that Plaintiffs were driving evasively by taking more turns than necessary while he followed them from a "covert distance"; and (3) even if Defendant did have an informant, neither Mr. Scruggs nor Ms. Northrup were the subject of the confidential tip.  (Id. at pp. 11–22.)

Defendant also argues he is entitled to summary judgment for several reasons.  Defendant first avers that, because he attempted to verify the tag number while conducting surveillance, his mistake of fact regarding the Avalanche's tag was objectively reasonable as he "did not wish to draw attention to himself," and that this mistake gave him a reasonable basis to initiate the stop. (Doc. 37-1, p. 15.)  Defendant additionally argues that he is entitled to judgment in his favor because the stop was reasonable in length and not unlawfully prolonged by the K-9 sniff.  (Id. at pp. 19–20.)  After seeing Mr. Scruggs' Tennessee license, Defendant suspected Mr. Scruggs was violating O.C.G.A. § 40-5-20(a)—which requires that persons residing in the state for more than 30 days obtain a Georgia driver's license—based on the pair's previous interactions.  (Id.) Defendant then wrote Mr. Scruggs a citation for the suspected violation, and because the K-9 sniff occurred prior to the citation's completion, Defendant maintains that the stop was not prolonged.  (Id. at p. 23.)  Finally, even if the tag mistake was not reasonable or the stop was unlawfully prolonged, Defendant contends that other factors created "sufficient reasonable suspicion to justify a traffic stop" and to await the K-9 unit.  (Id. at pp. 16, 24.)  Specifically, Defendant relies on: (1) the previous arrest and drug activities at 330 Broadway Street; (2) the confidential informant's tip; (3) the presence of the vehicle at 330 Broadway Street; and (4) his contention that Plaintiffs took an evasive route while he followed them.  (Id. at pp. 18–19.)

Thus, resolution of Plaintiffs' Fourth Amendment claims and the parties' Motions requires the determination of whether Defendant's actions prior to and during the traffic stop

were reasonable, as well as whether Defendant had reasonable suspicion of illegal activity that justified any prolongation of the stop to allow for additional investigation such as the K-9 sniff.

## II.     Legal Authority

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.   A traffic stop is a seizure within the meaning of the Fourth Amendment and is justified when the police have reasonable suspicion that a traffic violation has occurred.  United States v. Campbell, 912 F.3d 1340, 1349 n.9 (11th Cir. 2019) ("While probable cause is sufficient, only reasonable suspicion is necessary.")   To determine whether an officer had adequate reasonable suspicion, the Court must examine the officer's actions and determine whether they were reasonable.  United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003); see also United States v. Knights, 534 U.S. 112, 118 (2001) ("The touchstone of the Fourth Amendment is reasonableness . . . .").

Additionally, the actions taken by an officer during a traffic stop "must be reasonably related in scope to the circumstances which justified the interference in the first place." Rodriguez v. United States, 575 U.S. ___, ___, 135 S. Ct. 1609, 1621 (2015) (citations omitted). The traffic stop itself may "'last no longer than is necessary' to complete its mission." Campbell, 912 F.3d at 1350 (quoting Rodriguez, 135 S. Ct. at 1614).  "A stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes."  Campbell, 912 F.3d at 1353.

## III.    Analysis

The Court acknowledges at the outset of its summary judgment analysis that this case is replete with factual disputes.  As detailed above, Plaintiffs and Defendant urge the Court to adopt

entirely different versions of what happened prior to the traffic stop and there is evidence to support both versions.   Defendant testified during his deposition that he was conducting surveillance at 330 Broadway Street and he later submitted an affidavit in support of this testimony.   (Doc. 37-3, p. 2.)   However, in the BCR, Defendant clearly states that he did not remember where he first saw Plaintiffs' vehicle and visibly searches a map on his phone for several minutes.   (Doc. 28-1, at 14:45:51–14:49:13 (BCR).)   Defendant eventually identifies McIntosh as the proper location and does not mention his purported presence at 330 Broadway Street at any point during the recording.   (Id. at 14:48:57.)   While Defendant acknowledges the inconsistency between what is depicted in the video and what he testified to later, he claims that his actions on the video were both purposeful and precautionary; he did not want the occupants of 330 Broadway Street to "become aware of his surveillance or the informant" and he knew the "body-camera recording would eventually become subject to inspection and copying."   (Doc. 53, p. 4.)   Plaintiffs understandably take issue with Defendant's story and point out that Defendant did not mention 330 Broadway Street or the alleged informant until fourteen months after the traffic stop and they therefore urge the Court to disregard Defendant's subsequent explanations. (Doc. 45, p. 2.)

Disputes of fact only interfere with the Court's ability to issue summary judgment (particularly where, as here, there are cross-motions) if the disputes are genuine and if the facts they concern are truly material.   Fed. R. Civ. P. 56(a).   The dispute here is genuine; that is, a reasonable jury could choose to believe either of Defendant's versions of the events leading up to the traffic stop—the version evinced by his statements on the BCR or the version he testified to

in his deposition and explained in his affidavit.[6]  See Georgia State Conf. of NAACP v. Fayette County Bd. of Comm'rs, 775 F.3d 1336, 1346–48 (11th Cir. 2015) (explaining court may not make credibility findings in reviewing cross-motions for summary judgment).  The issue that must be addressed by the Court in greater detail, however, is whether these genuine disputes "might affect the outcome of the suit under the governing law" and are therefore material.  FindWhat Inv'r Grp., 658 F.3d at 1307.  A genuine dispute over even the most seemingly important fact is not necessarily material.  For instance, "[i]f a party fails to establish a genuine dispute as to any essential element of his case on which he has the burden of proof, summary judgment is appropriate even if there are disputes as to other facts, because the failure of proof on the essential element renders all other facts immaterial."  McKeithen v. Jackson, 606 Fed. Appx. 937, 938 (11th Cir. 2015).

As set forth in greater detail below, the Court finds that the genuine disputes regarding the events that occurred prior to the stop are material to the determination of whether the initial stop was reasonable and whether Defendant had reasonable suspicion to prolong the stop (to investigate suspected criminal activity unrelated to the basis for the stop).  As a result, neither Plaintiffs nor Defendant are entitled to summary judgment in their favor on either claim.

### A.      Whether Defendant had an Objectively Reasonable Basis to Initiate the Traffic Stop

The parties dispute whether Defendant had a reasonable basis to initiate the traffic stop. An officer's reasonable mistake of fact may provide the objective grounds for reasonable suspicion or the probable cause required to justify a traffic stop.  Chanthasouxat, 342 F.3d at

---

[6] See McCormick v. Ft. Lauderdale, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment.");

1276.  Thus, if an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable.  Id.

Here, it is undisputed that Defendant called in the tag number "PHU1437" at 1:45 p.m. and that the tag came back to a Toyota Corolla.  (Doc. 53-1, p. 2.)  It is similarly undisputed that the Avalanche's tag number was "PHU1387."  (Id.)  According to Defendant, this call was made after he observed the Avalanche parked at 330 Broadway Street, looked at the license plate as he drove past the house, and parked further down the street.  (Doc. 37-1, p. 5.)  Defendant maintains that his mistake of fact—the misreading of the Avalanche's tag number—was caused by his being in "surveillance mode," which prevented him from getting a clear visual of the correct tag number.  (Id. at p. 4–5.)  Defendant therefore argues that his mistake about the Avalanche's license plate number provided an objectively reasonable basis to suspect that a tag violation had occurred.  (Id.)

Plaintiffs, on the other hand, emphasize different portions of the record.  Relying on Defendant's statements captured by the BCR—questioning where he first saw the Avalanche and eventually identifying McIntosh as the correct location—Plaintiffs contend that Defendant was not actually conducting surveillance prior to the traffic stop.  They urge that these statements do not support Defendant's contention that he made a mistake regarding the Avalanche's tag.  Rather, Plaintiffs argue the evidence supports their theory "that, at 1:45 p[.]m[.], [Defendant] correctly called in the tag on a Toyota Corolla in which he had taken an interest," and, thirty minutes later, "saw Scruggs, whom he knew from his earlier warrant and arrest actions, driving the Avalanche at McIntosh Avenue," and decided to stop his vehicle under the guise of a tag issue.  (Doc. 58, p. 10.)

If Plaintiffs' version of the facts is accepted as true, Defendant's alleged mistake would be unreasonable as it would not have been a mistake at all.  Under their theory, Defendant did not attempt to verify the Avalanche's plates prior to initiating the stop, meaning he stopped the Avalanche without any suspicions or concerns about its tag number.  (Id.)  On the other hand, if Defendant's testimony that he was conducting surveillance is accepted as true, it is reasonable to believe that he did attempt to call in the Avalanche's tag but was unable to clearly see the plate until the traffic stop was initiated.  Because both parties have moved for summary judgment on this issue and a jury could accept either version of the facts, the Court cannot declare, as a matter of law, whether the stop was the result of an objectively reasonable mistake of fact or whether it instead was initiated without the necessary probable cause.  A jury must first determine whether Defendant stopped the Avalanche because he knew it belonged to Mr. Scruggs—an individual whom Defendant knew had previously been arrested in connection with a drug investigation—or if Defendant was simply mistaken.  As explained above, "[i]ssues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment."  McCormick, 333 F.3d at 1240 n.7.  Accordingly, summary judgment for either party is not proper on the issue of whether it was reasonable for Defendant to stop Plaintiffs' vehicle.

**B.      Whether Defendant Prolonged the Stop Without Reasonable Suspicion**

The parties each claim that, regardless of whether the initial stop was justified, they are entitled to judgment in their favor on the issue of whether, after he stopped Plaintiffs, Defendant prolonged the stop in order to investigate other criminal activity (not related to the traffic infraction) without reasonable suspicion for doing so.  While "[a] seizure for a traffic violation justifies a police investigation of that violation," such a seizure is generally expected to be a

"relatively brief encounter" and "the tolerable duration . . . in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." Rodriguez, 135 S. Ct. at 1614 (citations omitted).  While a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  Id. at 1615 (explaining that a K-9 search is "not fairly characterized as part of the officer's traffic mission" because it is a measure aimed at detecting evidence of criminal wrongdoing and lacks a close connection to roadway safety).  Put another way, an officer unlawfully prolongs a stop when he "(1) conduct[s] an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion." Campbell, 912 F.3d at 1353.

### 1.    Whether Defendant Prolonged the Traffic Stop

Plaintiffs argue that Defendant extended the stop's duration to investigate criminal activity unrelated to the stop by doing the following: after receiving Plaintiffs' driver's licenses and the car's registration, Defendant did not immediately return to his car to verify the information but instead attempted to search the vehicle; even though he claimed that he had stopped the car for a tag violation, once he returned to his vehicle, Defendant called for K-9 units prior to verifying the tag information; and, after the service was unable to verify Mr. Scruggs' Tennessee license, Defendant spent over twenty minutes talking with other officers instead of diligently filling out the citation form.  (Doc. 26-1, pp. 24–27.)  Defendant disagrees, and claims he was conducting permissible "ordinary inquiries" and was completing the citation form at all

times prior to the end of the stop.  (Doc. 53, pp. 19–20.)  Defendant also points to the fact that the citation was not complete until after the K-9 had completed the search.[7]  (Id. at p. 23.)

"Authority for [a] seizure [for a traffic violation] ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  Rodriguez, 135 S. Ct. at 1611.  "[A] traffic stop prolonged beyond that point is unlawful."  Id. at 1616.  Thus, a stop can be unlawfully prolonged even if done expeditiously.  Campbell, 912 F.3d at 1352.  An officer may "conduct certain unrelated checks during an otherwise lawful traffic stop," as long as such activities—like a K-9 sniff—do not "measurably extend" the duration of the stop.  Rodriguez, 135 S. Ct. at 1614–15.

The undisputed facts demonstrate both that Defendant conducted several unrelated inquiries aimed at investigating other crimes and that these acts added time to the stop.  See Rodriguez, 135 S. Ct. at 1616 (investigation into "crime in general [and] drug trafficking in particular" not related to traffic stop); Campbell, 912 F.3d at 1355–56 (questions about contraband in vehicle during traffic stop unrelated to stop's mission).  Prior to addressing the original reason for his stop—a suspected tag violation—Defendant asked whether Plaintiffs had any drugs in their vehicle and asked to search the Avalanche.  (Doc. 28-1, at 14:20:48–14:21:15.)  This detour added about thirty seconds.  Defendant also spent about four minutes calling

---

[7]  Defendant urges that, as a matter of law, the stop was not prolonged because the K-9 search was completed before he had finished writing the citation.  (Doc. 37-1, p. 23.)  This argument misstates the law. The United States Supreme Court has held that it "is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.'"  Rodriguez, 135 S. Ct. at 1616.  Additionally, it is possible for an officer to take an unreasonable amount of time simply in addressing the traffic stop's mission.  Id. at 1614; see also United States v. Wilson, 662 F. App'x 693, 696 (11th Cir. 2016) ("[A] traffic stop becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission.") (citations omitted).  Thus, the mere completion of the K-9 search prior to the citation's completion is not determinative of the stop's legality; if Defendant acted in such a way to ensure the citation was not complete before the K-9 unit could search Plaintiffs' car, this behavior would support a finding that the K-9 search added time to the stop.  See Rodriguez, 135 S. Ct. at 1616; Campbell, 912 F.3d at 1353 n.14 ("Of course, [an] officer could be so slow as to warrant a claim that the officer was not diligent.") (citing id.).

dispatch to summon a K-9 unit prior to addressing either the tag or license concerns.  (Id. at 14:21:58–14:25:40.)  It is well-established that a dog sniff "is not an ordinary incident of a traffic stop."  Rodriguez, 135 S. Ct. at 1616.  Further, after Officer Clark arrived, Defendant stated he was trying to determine Mr. Scruggs' probation status to "conduct a Fourth Amendment search on him," (id. at 14:30–14:31:30), an inquiry that took approximately seven minutes and thirty seconds, (id. at 14:30–14:37:35).  While an officer is entitled to check criminal records or for outstanding warrants as a "negligibly burdensome precaution[] in order to complete his mission safely," id. at 1616, Defendant's explicit statement in the BCR discloses that his concern was not his own safety but potential criminal activity unrelated to the traffic stop.

The foregoing undisputed evidence indicates that, when all of Defendant's delays are added together, Defendant prolonged the traffic stop for the purpose of conducting unrelated inquiries aimed at investigating other crimes.

### 2. Whether Defendant had Reasonable Suspicion to Prolong the Stop

Having determined that Defendant prolonged the traffic stop to conduct unrelated activities, the Court must determine whether he had reasonable suspicion that justified his doing so.  See Campbell, 912 F.3d at 1353.

To have reasonable suspicion, an officer must "have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity."  United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000).  "The 'reasonable suspicion' must be more than 'an inchoate and unparticularized suspicion or hunch.'"  Id. (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)).  The Court looks to the "'totality of the circumstances'" to determine whether an officer had "'a particularized and objective basis for

suspecting legal wrongdoing.'" <u>United States v. Lindsey</u>, 482 F.3d 1285, 1290 (11th Cir. 2007) (quoting <u>United States v. Arvizu</u>, 534 U.S. 266, 122 S. Ct. 744, 750 (2002)).

To support his argument that he had reasonable suspicion which justified any actions taken during the traffic stop, Defendant points to the tip from his informant, the Avalanche's presence at a location previously associated with drug activity, and Plaintiffs' evasive driving. (Doc. 53, pp. 10–11.)  Defendant contends that these circumstances render any delay whilst waiting for the K-9 legally permissible.  (<u>Id.</u>)  In response, Plaintiffs point to the BCR and argue that, because the evidence shows that Defendant was not conducting surveillance at 330 Broadway Street, did not have an informant, and stopped Plaintiffs under the guise of a tag violation, there is no basis for a finding that he had a reasonable suspicion that Plaintiffs were involved in illegal drug activity.  (Doc. 26-1, pp. 24–27.)

As described previously herein, there is sufficient evidence to support each of the competing versions of the events leading up to the stop of Plaintiffs' vehicle.  Under one set of facts, Defendant was conducting surveillance based on the informant's tip that drugs were being sold at 330 Broadway Street (where Defendant had knowledge of prior drug activities and arrests having taken place), Defendant observed the Avalanche at 330 Broadway Street, mistakenly believed that the Avalanche bore another vehicle's license plate, and witnessed Plaintiffs driving the Avalanche in what he believed to be an evasive manner.  Under the other set of facts— Defendant's statements recorded in the BCR—Defendant had no basis for suspecting the Avalanche and its occupants were involved in anything more than mere traffic violations, if that. Given the extreme divergence between the two sets of facts, there is no way the Court can say that, as a matter of law, Defendant did or did not have a reasonable suspicion of criminal activity

that justified any prolongation of the stop. Thus, the Court declines to grant summary judgment to either party on this issue.

### C.    Qualified Immunity

Finally, in his Motion for Summary Judgment, Defendant contends that because the facts demonstrate he had reasonable suspicion to initiate a traffic stop, he is entitled to qualified immunity on Plaintiffs' § 1983 claim. (Doc. 37-1, p. 29.) Defendant is the sole movant on this issue. Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002).

To receive qualified immunity, government officials must first establish that they were acting within their discretionary authority during the events in question. Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir. 2013). Discretionary authority includes all actions of a governmental official that "(1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Dang ex rel. Dang v. Sheriff, Seminole Cty., 871 F.3d 1272, 1279 (11th Cir. 2017) (quoting Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988)). Here, Plaintiff does not contest this issue, and it appears that Defendant was acting within his discretionary authority. Defendant, a narcotics investigator for Glynn County, pulled over Plaintiffs pursuant to his authority to address violations of the law.

Once a defendant establishes that he was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Dang, 871 F.3d at 1279 (quoting Lee, 284 F.3d at 1194). To make this showing, a plaintiff

"must first prove that the facts alleged, construed in the light most favorable to [them], establish that a constitutional violation did occur." Shaw v. City of Selma, 884 F.3d 1093, 1099 (11th Cir. 2018) (citing Smith v. LePage, 834 F.3d 1285, 1291 (11th Cir. 2016)); see also Saucier v. Katz, 533 U.S. 194, 200 (2001). A plaintiff must also show that the law existing at the time the conduct occurred clearly established that the conduct violated the Constitution. Pearson v. Callahan, 555 U.S. 223, 232–36, (2009).

As laid out above, the facts, when construed in the light most favorable to Plaintiffs, establish that Defendant violated the Fourth Amendment by unlawfully prolonging the traffic stop to investigate other crimes without reasonable suspicion. While a defendant who asserts qualified immunity only needs evidence to support a finding of "arguable" reasonable suspicion, the Court's conclusion remains the same. Jackson v. Sauls, 206 F.3d 1156, 1166 (11th Cir. 2000) ("When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had arguable reasonable suspicion to support an investigatory stop." (internal quotation marks omitted)). Viewing the evidence in the light most favorable to Plaintiffs, Defendant cannot rely on any of the circumstances he claims show he had reasonable suspicion. Without *any* circumstances to create "a particularized and objective basis for suspecting" that Plaintiffs were engaged in drug-related activity, Defendant lacked even arguable reasonable suspicion to prolong the stop.[8]

Having alleged a constitutional violation, Plaintiffs must demonstrate "that law existing at the time . . . clearly established that the conduct violated the constitution." Shaw, 884 F.3d at

---

[8] Despite this finding, the Court stresses that this analysis is based purely on the facts taken in the light most favorable to Plaintiffs, and a jury could choose to believe Defendant's version of the facts, which could possibly establish arguable reasonable suspicion.

1099 (citing <u>Pearson</u>, 555 U.S. at 232–36).[9]  Here, Plaintiffs argue that "[a] reasonable police officer [] working in 2017 [at the time of the traffic stop] had fair warning of Supreme Court precedents recognizing the inherent rights of individuals, under the Fourth Amendment,[] to be free from [(i)] stops unsupported by objective reasonable suspicion; and (ii) stops exceeding the time necessary to complete the mission which justified the stop."  (Doc. 45, p. 15.)  The Court agrees; the at-issue traffic stop occurred in early 2017, long after most of the law cited throughout this Order was decided.  Thus, it was clearly established at the time of the alleged constitutional violation that a traffic stop lasting longer than the time necessary to process the traffic violation without reasonable, articulable suspicion of other illegal activity violates the Fourth Amendment.  <u>See, e.g.</u>, <u>Rodriguez</u>, 135 S. Ct. at 1614–1616 (holding, in 2015, that a traffic stop prolonged beyond the amount of time reasonably required to complete the mission is unlawful); <u>Wilson</u>, 662 F. App'x at 696 (holding, in 2016, that a dog sniff that takes place during the *reasonable* course of a lawful traffic stop is not subject to Fourth Amendment scrutiny); <u>Lindsey</u>, 482 F.3d at 1290 (explaining, in 2007, that courts look to the totality of the circumstances to address reasonable suspicion); <u>Powell</u>, 222 F.3d at 917 (holding, in 2000, that the reasonable suspicion that is required for investigatory stop must be more than inchoate and unparticularized suspicion or hunch and a detaining officer must have minimal level of objective justification taken from totality of circumstances).  Accordingly, the facts of this case, taken in the light most favorable to Plaintiffs, indicate that Defendant violated Plaintiffs' clearly established Fourth Amendment right to be free from unreasonable seizures.

In light of the foregoing, Defendant George is not entitled to qualified immunity and the Court denies his Motion on this issue.  (Doc. 37.)

---

[9]  Courts may "exercise their sound discretion in deciding" what order to analyze the constitutional violation and clearly established right prongs.  <u>Pearson</u>, 555 U.S. at 236.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and Request for Oral Argument, (doc. 26), and **DENIES** Defendant's Motion for Summary Judgment, (doc. 37).

**SO ORDERED**, this 8th day of March, 2019.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA